# United States Court of Appeals
## For the First Circuit

No. 15-1652

UNITED STATES OF AMERICA,

Appellee,

v.

MANUEL CALDERÓN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Lynch, Selya, and Lipez,
Circuit Judges.

George J. Vila for appellant.
John-Alex Romano, Criminal Division, Appellate Section, U.S.
Department of Justice, with whom Rosa Emilia Rodríguez-Vélez,
United States Attorney, Nelson Pérez-Sosa, Chief, Appellate
Division, United States Attorney's Office, Leslie R. Caldwell,
Assistant Attorney General, Sung-Hee Suh, Deputy Assistant
Attorney General, and Robert A. Parker, Criminal Division,
Appellate Section, U.S. Department of Justice, were on brief, for
appellee.

July 15, 2016

**LIPEZ**, **Circuit Judge**.    Appellant Manuel Calderón, convicted for making a false statement to a federal grand jury investigating a money laundering scheme, argues that the district court abused its discretion in refusing to grant him a new trial based on the government's now-acknowledged improper withholding of impeachment evidence and its failure to disclose other information that Calderón claims tainted his indictment and prosecution.  He also challenges the court's refusal to order release of a grand jury transcript.  Finding his claims unavailing, we affirm.

**I.**

**A. Factual Background**

The facts underlying this appeal, as the jury could have found them, are as follows.    Appellant Calderón was a sales representative and manager of two related businesses in Florida that law enforcement authorities targeted in an investigation into money laundering.    The businesses, GSM City and GSM City Supercenter ("Supercenter"), were wholesalers of cellular phones and cellphone accessories.    GSM City was established first, and its employees, including Calderón, transferred to Supercenter when it subsequently was opened by the same owners in a nearby location. In effect, the business that previously had been known as GSM City became Supercenter.[1]

_____

[1] In his opening statement at trial, the prosecutor said that GSM City was "reincorporated" as GSM City Supercenter, and a

In 2010, undercover officers working for the United States Drug Enforcement Administration ("DEA") went to GSM City on multiple occasions and gave large amounts of cash to Calderón. Each time, Calderón would take the cash and count it, and the officers would then leave without receiving any merchandise. Two DEA officers, Steve Díaz and Peter Guevara, participated in a combined total of five such transactions between March and November 2010.

The DEA also engaged an employee of GSM City, Angel Delguercio, as a confidential informant. Delguercio testified that it was "common practice" for GSM City customers to come into the store with $5,000 to $80,000 in cash, which Calderón would count with a machine or by hand. Delguercio testified that those transactions occurred weekly. He also reported that it was similarly common for employees at Supercenter to receive cash payments from customers. During his direct examination, Delguercio testified that he saw Calderón counting cash at Supercenter weekly. However, he changed his account during

---

government witness who worked at both stores testified that the business "moved from one building to another building, and they merged or changed their legal name." The government presented evidence that Calderón was listed as one of the "managing members" in Supercenter's articles of incorporation, along with Shamin Azad and Amjad Azad. With respect to GSM City, the government witness testified that "[t]o me [Calderón] was one of the owners, he ran the business," but he also identified the Azads as the owners of both businesses.

- 3 -

questioning in cross-examination and on redirect, stating that he had not seen -- or did not remember seeing -- Calderón himself receive or count the cash payments received at that store, although "it was a big chance, a possibility."

In 2012, Calderón appeared before a federal grand jury in Puerto Rico investigating the money laundering scheme. During his testimony, in which he initially explained how GSM City operated, Calderón answered the questions posed to him as follows:[2]

> Q.  [A]nd that is how GSM City worked?
> A.  [Y]es.
> Q.  [W]hen you were working there?
> A.  [Y]es.
> Q.  [S]o a customer would call in and say, I want to buy a hundred phones.
> A.  [Y]es.
> Q.  [A]nd you would give them 30 days to pay?
> A.  30 days to pay or if the customer in less than 30 days they would need more merchandise and let's say they already have their limit already filled up, then they had to pay what they owe in order to take the new order.
> Q. [O]kay.  So you would receive wires only from customers that had gone through that process?
> A.  [Y]es, or they were registered with the company already.
> Q. [O]kay, and what would happen if the company received payment from another source

---

[2] We reproduce the grand jury testimony from the trial transcript as it was read into the record, with emphasis supplied for the questions and answers that were the basis for Calderón's prosecution.  At trial, the prosecutor read the questions, and the court reporter who had transcribed the grand jury testimony as it was given read Calderón's answers.  We have omitted from each line the introductory words read at trial -- either "Question" or "Answer" -- and have therefore used brackets to capitalize the new "first" word on each line.

- 4 -

that is not registered, is it accepted or what would happen?

A. [N]o, it would not be accepted.

Q. [N]o?

A. [N]o, we always dealt with the customer that wire us when we were working with them. Who ever wanted to buy from us they had to register as a company.

Q. [A]s far as you understand that is how GSM City operated?

A. [S]upposedly, yes.

Q. GSM City?

A. GSM City and GSM City Supercenter.

Q. [A]nd then would anybody go in with cash?

A. [W]e have people coming from overseas that they use to declare the cash in Customs at the airport and they use to pay so we use to report them.

Q. [H]ow?

A. [W]ith the IRS form and we take their passport.

Q. [D]id you ever personally receive cash for a purchase?

A. [T]hat was account.

Q. [Y]ou did?

A. [A]ccount, account, account department, we had departments.

**Q. [B]ut my question is did any customer ever come to you and say listen, here is $50,000 or here is $10,000 for these phones that I wanted to order.**

**A. [N]o, because account had to deal with that department.**

Q. [N]ot the sales person?

A. [N]ot the sales person.

**Q. [Y]ou never had to count any money or anything?**

**A. [N]o.  Count money just to pay that we had to pay somebody that we owe, but that is about it, but not like received money.**

In August 2013, Calderón was indicted on one count of making a false declaration before a federal grand jury, in violation of 18 U.S.C. § 1623.  The indictment alleged that he knowingly

- 5 -

testified falsely that he never received cash when, in fact, he had received approximately $181,000 in cash payments between March and June 2010 "from various individuals at GSM City, a.k.a. GSM City Supercenter."

A two-day trial was held in February 2014. Calderón's defense was that the grand jury questions at issue were ambiguous because they sometimes referred to "GSM City" and sometimes to "GSM City Supercenter." Highlighting Delguercio's testimony on cross-examination that he did not remember seeing Calderón handle cash at Supercenter, defense counsel argued to the jury that the government had produced no evidence that Calderón had received or counted cash there, and "[i]f [Calderón] was thinking that the question was referring to Supercenter, then his answer was true." Hence, counsel asserted, Calderón could not be convicted for making a false statement if the jury found that he reasonably believed the questions were focused solely on Supercenter. The jury, however, found Calderón guilty.

## B. Post-Trial Proceedings

Less than a week after the verdict, Calderón filed a motion seeking a new trial, in which he asserted multiple flaws in his trial. In the original motion, which was later supplemented, he challenged statements made by a government witness and the prosecutor and asserted that the evidence presented was insufficient to support the verdict. Calderón has not appealed

the court's denial of his new trial request based on those grounds, and we do not further address them.

In the first supplement, Calderón claimed that newly discovered evidence revealed that the government had withheld impeachment evidence in violation of the disclosure requirements of Giglio v. United States, 405 U.S. 150 (1972).[3] Specifically, he argued that the government had improperly failed to disclose that Delguercio had been charged with stealing cell phones from Supercenter while employed there, information suggesting a "motive to be untruthful in his trial testimony" -- i.e., to retaliate against store management, including Calderón. This credibility-related evidence was significant to his defense, Calderón claimed, because Delguercio was the only witness who referred to Calderón's handling of cash while at Supercenter. If the jury found that Calderón could have construed the question about handling cash to refer only to Supercenter, the retaliatory motive of the sole witness who cast doubt on Calderón's "no" answer would have been favorable impeachment material.

---

[3] Under Brady v. Maryland, 373 U.S. 83 (1963), the "suppression of favorable evidence violates due process if the evidence is material to guilt or punishment." United States v. Misla-Aldarondo, 478 F.3d 52, 63 (1st Cir. 2007). In Giglio, the Supreme Court applied Brady's disclosure obligation to "information potentially useful in impeaching government witnesses." Id.

- 7 -

The second supplemental filing focused on proceedings in a related Florida criminal case, in which Calderón and the Azad brothers (the owners of GSM City and Supercenter) were charged with evading federal reporting requirements for cash transactions. Calderón informed the court that the Florida prosecutor had alerted the judge in that case to the government's intention to seek a superseding indictment because of two problems affecting the original Florida indictment. First, a law enforcement officer who had made undercover cash drops for the DEA at GSM City had pleaded guilty in an unrelated case to credit-card fraud and extortion. As a result, the government decided not to pursue the counts in the original Florida indictment that depended on the testimony of that officer, Richard Muñoz. Second, the original indictment contained a factual inaccuracy. It listed several cash deliveries that investigators had told the grand jury were made by undercover officers, but they were in fact made by confidential informants.

Calderón asserted that the Puerto Rico grand jury proceedings were tainted by the same problems -- i.e., the "rogue-agent's criminal conduct" and the factual inaccuracies -- that affected the Florida prosecution. In addition, he argued that the government violated its Brady/Giglio obligations by failing to disclose Muñoz's indictment and plea negotiations, asserting that the government must have known of those events when his trial began. Calderón subsequently moved for production of the Puerto

- 8 -

Rico grand jury transcript so that he could substantiate his claims.

In response to the new trial motion, the government argued, inter alia, that neither Delguercio's arrest nor Muñoz's conviction was impeachment evidence within the scope of Giglio, and that Muñoz's prosecution was in any event irrelevant to Calderón's case.  With respect to Muñoz, the government stated that he was not involved in the grand jury proceedings in Puerto Rico, and the DEA agent who presented information to that grand jury did not directly rely on evidence obtained by Muñoz.  In addition, the government said it had not used evidence related to the cash deliveries made by Muñoz against Calderón at trial.  As for the factual mistake in the Florida testimony concerning two deliveries made by confidential informants, rather than undercover agents, the government stated that no such inaccurate information was provided in the Puerto Rico proceedings.

The district court ruled that Delguercio's arrest should have been disclosed under Giglio.[4]  United States v. Calderón, No. 13-cr-00515, slip op. at 27 (D.P.R. Feb. 27, 2015).  The court noted that it would be "natural" to conclude that Delguercio was biased against Calderón because Supercenter -- which Calderón managed --

---

[4] In its appellate brief, the government "concedes that, in retrospect, it should have disclosed Delguercio's arrest on state theft charges to Calderón prior to trial."  Appellee's Br. at 11.

had reported Delguercio's alleged theft of phones.  The court observed: "Such a conclusion, if drawn, clearly aims at Delguercio's credibility, and thus, at the very least, may have been useful in impeaching him."  The court added that the undisclosed material may have been particularly useful in light of Delguercio's testimony that he cooperated with the government "because he had been told it was the right thing to do and he had not been accused of doing anything wrong."  The court nonetheless concluded that Calderón had not shown a reasonable probability that disclosure of the withheld evidence about Delguercio would have produced a different outcome at trial and, hence, the court rejected the need for a new trial on that basis.

With respect to the undisclosed Florida information, the court concluded that no Brady/Giglio violation occurred.  The court noted that the material about Muñoz's arrest and plea was not useful for impeachment, as Muñoz did not testify at Calderón's trial, and it found no relevance in Muñoz's unrelated conviction to the defendant's guilt or innocence.  The court also saw no potential value to Calderón's defense from the inaccuracy in the Florida grand jury testimony, which "pertain[ed] to whether money was delivered by a police officer or a confidential source."  The court further rejected any implied challenge to the propriety of the indictment, stating that Calderón "provides no legal basis to

do so at this stage in proceedings." The court denied as moot Calderón's motion to produce the grand jury transcript.

On appeal, Calderón reiterates his Brady/Giglio claims. He argues that the district court abused its discretion in failing to order a new trial based on the government's withholding of evidence and the "tainted" indictment that resulted from reliance on Muñoz's testimony and the factual inaccuracy about deliveries. He also challenges the court's refusal to order release of the Puerto Rico grand jury transcript.

## II.

To obtain a new trial based on newly discovered evidence under Federal Rule of Criminal Procedure 33, the defendant is ordinarily required to show that (1) the evidence at issue was either unknown or unavailable to him at the time of trial, (2) his failure to discover the evidence was not due to his own lack of diligence, (3) the evidence was material, and (4) access to it "will probably result in an acquittal upon retrial." United States v. Flores-Rivera, 787 F.3d 1, 15 (1st Cir. 2015) (quoting United States v. González-González, 258 F.3d 16, 20 (1st Cir. 2001)).

In the context of a Brady/Giglio claim, however, a "more defendant-friendly" standard applies to the prejudice inquiry encompassed by the third and fourth prongs. Id. (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)). Rather than showing that "an acquittal would have 'probably' resulted," the defendant must

establish only a "reasonable probability" of a different outcome if the government had disclosed the evidence prior to trial. Id. at 15-16 (quoting González-González, 258 F.3d at 20). We have explained that, under this latter approach, a defendant can prevail "when the government's evidentiary suppression undermines confidence in the outcome of the trial." United States v. Avilés-Colón, 536 F.3d 1, 20 (1st Cir. 2008) (quoting Kyles, 514 U.S. at 434). That is to say, a "reasonable probability" of a different outcome does not exist if the trial, despite the absence of the improperly withheld evidence, "can produce 'a verdict worthy of confidence.'" Flores-Rivera, 787 F.3d at 16 (quoting González-González, 258 F.3d at 20).

Absent legal error, the district court's ruling on a motion for new trial based on alleged Brady/Giglio violations is reversible only for "manifest abuse of discretion." United States v. Alverio-Meléndez, 640 F.3d 412, 423 (1st Cir. 2011) (quoting United States v. Brandao, 539 F.3d 44, 64 (1st Cir. 2008)); see also González-González, 258 F.3d at 20. Calderón complains that the district court improperly rejected both Brady/Giglio claims asserted in his supplemental filings. We consider each in turn.

## A. Delguercio's Arrest

As a threshold matter, Calderón contends that the district court improperly used a sufficiency-of-the-evidence analysis to assess the impact of the government's failure to disclose

- 12 -

Delguercio's arrest.  We reject this assertion.  Indeed, the court expressly recognized that "[t]he undermine-confidence inquiry . . . is not a sufficiency of the evidence test."  Calderón, slip op. at 8.  It examined sufficiency solely as a starting point for its Giglio analysis and, after finding ample evidence of guilt, stated that "[t]his . . . is not the battle to be waged for purposes of analyzing suppressed Giglio material."  Id. at 9.  The court then proceeded to carefully consider the potential impact of the evidence of Delguercio's arrest in light of the defense theory, guided by factors we have previously identified for assessing materiality: "(1) [the] evidentiary strength [of the suppressed information]; (2) whether it was cumulative of other evidence offered at trial; (3) whether the matters on which it would have allowed impeachment were collateral; and (4) whether the matters on which impeachment would have been made possible were otherwise corroborated."  Id. at 8 (quoting United States v. Paladin, 748 F.3d 438, 444 (1st Cir. 2014)).

The court noted that Calderón's depiction of the Delguercio evidence as highly significant was linked to his theory that the questions posed to him by the grand jury were ambiguous, meaning that the jury could have found that his response denying the receipt of cash referred only to his time at Supercenter. Confining his "no" answer to Supercenter was necessary for the defense because the two law enforcement officers, Díaz and Guevara,

had testified to giving Calderón cash at GSM City, and photographs of the cash Calderón received from them were introduced into the record. Indeed, defense counsel conceded the GSM City transactions in his closing argument. Delguercio, however, was the only witness whose testimony supported a finding that Calderón also had received and counted cash at Supercenter.

The district court nonetheless identified multiple reasons why Calderón had not shown a reasonable probability of a different verdict even if he had known about Delguercio's arrest. First, the court noted "the detailed cross-examination of Delguercio's testimony that actually occurred," pointing out that Delguercio was "thoroughly questioned" about his cooperation with the government and the financial benefits he received. Id. at 11-12. The court also highlighted defense counsel's closing argument, which urged the jury not to credit Delguercio's testimony because his motive to testify was that he was "getting paid to set people up." Id. at 12. Hence, while the arrest evidence would have enhanced that credibility challenge by potentially introducing an issue of bias distinct from self-interest, "it still would have addressed a subject that had already been brought to the jury's attention -- Delguercio's motivation for testifying." Id.; see, e.g., Paladin, 748 F.3d at 447 (noting that the undisclosed evidence was cumulative because "the principal focus of the defense on cross-examination sought to undermine [the witness's]

credibility by suggesting to the jury that [he] . . . was willing to lie to serve his own interests," and, hence, that evidence would have only "permitted one additional avenue to accomplish this same objective").

Second, the court observed that the importance of the undisclosed evidence depended on two jury findings: that Calderón construed the grand jury questions to address only Supercenter, and -- based on Delguercio's testimony -- Calderón lied when he said he had not handled cash at that store. The court found it not reasonably probable that the jury had accepted Calderón's theory that the questions were ambiguous -- causing him to reasonably believe the inquiry was only about Supercenter -- but then found him guilty beyond a reasonable doubt based on Delguercio's equivocal testimony that there was "a possibility" that Calderón handled cash there. The court found it "far more likely" that the jury applied the "clear instruction" it gave on the issue of ambiguity,[5] and found the grand jury questions to be unambiguous. The court then stated its view of the jury's ultimate finding: "Specifically, when defendant was asked whether he "[]ever" had to count any money, that ever meant ever, and thus,

---

[5] In part, the jury was instructed: "If you should find a particular question was ambiguous and that the defendant truthfully answered one reasonable interpretation of the question under the circumstances presented, then such answer would not be false."

included the time that he worked at GSM City Inc." Calderón, slip op. at 13 (footnote omitted).

We find the district court's reasoning supportable. A series of questions posed to Calderón during the grand jury proceeding had focused on the business methods of GSM City before Calderón was asked: "[A]s far as you understand that is how GSM City operated?" His answer, along with the next question and response, reported that the business methods also applied to Supercenter:

> A. [S]upposedly, yes.
> Q. GSM City?
> A. GSM City and GSM City Supercenter.
> Q. [A]nd then would anybody go in with cash?
> A. [W]e have people coming from overseas that they use to declare the cash in Customs at the airport and they use to pay so we use to report them.

A few questions later, Calderón was asked if he "ever personally receive[d] cash for a purchase," to which he replied, "[T]hat was account." After a few more questions about cash from customers, he was asked, "[Y]ou never had to count any money or anything?" He replied, "no," explaining that he counted money to pay debts, "but not like received money." In context, we think it unlikely that the jury would have construed Calderón's responses -- saying, in effect, that it was not his job to count money -- as intended to refer exclusively to Supercenter. Hence, with direct evidence that Calderón had received cash at GSM City, evidence of his activity at Supercenter would have been cumulative. Accordingly,

we think it highly unlikely that Delguercio's testimony had decisive impact on the jury's finding that Calderón gave a false statement to the grand jury.[6]

We thus find no abuse of discretion in the district court's rejection of Calderón's new-trial request based on a finding that it was not reasonably probable that timely disclosure of Delguercio's arrest would have produced a different result at trial.

## B. Proceedings in the Florida Case

Calderón argues that the district court erred in determining that the information the prosecutor revealed in the Florida case -- Officer Muñoz's conviction and the faulty attribution of some cash deliveries at GSM City -- did not constitute Brady/Giglio material for his Puerto Rico prosecution. We disagree.

We note first that Muñoz's guilty plea pursuant to a plea agreement was entered on March 13, 2014, more than a month after the conclusion of Calderón's trial, and the record contains no evidence indicating that the Puerto Rico prosecutors knew about

---

[6] Indeed, the timing of the pertinent events -- a factor the court did not mention -- diminishes the likelihood that the arrest would have played a significant role, to Calderón's advantage, in the jury's assessment of Delguercio's credibility. Delguercio agreed to cooperate with the government in 2010, but he was not charged with the theft until 2013. He therefore assisted the government before he had reason to retaliate against Calderón. Nonetheless, although the earlier decision to cooperate might have lessened the bias theory, the possibility of retaliatory motivation would have been useful in the 2014 trial.

that unrelated criminal case during the trial.  Indeed, the superseding information charging Muñoz, and to which he pled, was filed on March 7, 2014 -- also after Calderón's trial -- and the Florida prosecutor's email alerting the judge in the Florida GSM City case to concerns about the Florida indictment is dated March 21.  Although Calderón speculates that the Puerto Rico prosecutors must have known about Muñoz's plea negotiations by the time his (Calderón's) trial started in early February, the record provides scant support for that hypothesis.[7]  The government cannot be faulted for failing to turn over information it did not have.  See, e.g., United States v. Hall, 434 F.3d 42, 55 (1st Cir. 2006); United States v. Rosario-Díaz, 202 F.3d 54, 66 (1st Cir. 2000).

Moreover, as the district court concluded, the information of concern in Florida was not significant for Calderón's defense in the Puerto Rico trial.  Muñoz did not testify and, hence, his unrelated criminal activity could not constitute impeachment evidence.[8]  In addition, we share the district court's view that Muñoz's crime was not exculpatory as to Calderón.  See Calderón,

---

[7] Calderón notes that Muñoz's prosecution bears a 2013 case number.  Although one co-defendant was indicted in October 2013, and a superseding indictment charging a second co-defendant was filed in January 2014, the superseding information naming Muñoz was not filed until March 2014.

[8] By contrast, the Florida prosecutor's email to the Florida court explained that Muñoz's testimony would have been the government's evidence for four of the counts in that indictment.

slip op. at 15 ("[T]he Court cannot discern how this information is relevant in any[]way to defendant's guilt or innocence.").  The jury heard direct testimony from Díaz and Guevara about their own cash deliveries at GSM City, and no reference was made to Muñoz.  Accordingly, Muñoz's role in the undercover operation, even if tainted by his criminal activity, was tangential -- at best -- to the jury's deliberations.

We likewise reject any suggestion by Calderón that the mistake in the Florida proceedings concerning several cash deliveries -- i.e., that they were made by confidential informants rather than undercover officers -- was pertinent to his guilt or innocence.  Indeed, other than the deliveries Díaz and Guevara testified that they made themselves, there was no evidence introduced at trial here linking particular cash drops to specific individuals.[9]  Hence, even if a jury might view criminal conduct reported by confidential informants differently from activity reported by police officers, that distinction was simply not relevant in the Puerto Rico trial.  We thus agree with the district court that the mistaken attribution of a few deliveries in testimony given before the Florida grand jury was immaterial to the jury's verdict.[10]

---

[9] Delguercio did not identify any of the people he saw delivering cash to Calderón as either police officers or confidential informants.

[10] Indeed, Calderón conceded as much before the district court, although he continues to invoke precedent on appeal (i.e.,

Accordingly, we find no abuse of discretion in the district court's rejection of the Brady/Giglio claim linked to the information that came to light in the Florida prosecution.

## III.

Calderón argues that the inaccurate information presented to the Florida grand jury also tainted the Puerto Rico grand jury proceedings and denied him "fundamental due process." This contention is a non-starter. "[T]he petit jury's verdict of guilty beyond a reasonable doubt demonstrates a fortiori that there was probable cause to charge the defendant[] with the offense[] for which [he] was convicted," and, hence, "any error in the grand jury proceeding connected with the charging decision [i]s harmless beyond a reasonable doubt." United States v. Mechanik, 475 U.S. 66, 67, 70 (1986); see also United States v. Reyes-Echevarría, 345 F.3d 1, 4 (1st Cir. 2003) ("All but the most serious errors before the grand jury are rendered harmless by a conviction at trial."); United States v. Ortiz de Jesús, 230 F.3d 1, 4 (1st Cir. 2000)

---

Brady/Giglio) that addresses the impact of improperly withheld evidence on the outcome of a defendant's trial. Specifically, in replying to the government's response to his second supplemental motion, Calderón accused the government of "divert[ing] the reader's attention to the evidence presented at trial." Calderón then continued: "This is not the issue. It should be abundantly clear that Defendant in his second supplement to the motion for new trial does not object to the evidence presented at trial, however does object to the tainted evidence that the Government presented to the grand jury to obtain the Indictment." We address the grand jury issue in the next section.

- 20 -

("Usually, the trial jury's verdict provides an adequate safeguard against the failings of the grand jury process."). The exception to this harmless error rule -- prosecutorial misconduct "so grave that it calls into doubt the fundamental fairness of the judicial process," Ortiz de Jesus, 230 F.3d at 4 -- is plainly inapplicable here.

In any event, the nature of the problematic information revealed in the Florida case belies Calderón's assertion of prejudicial taint. Muñoz's conviction for crimes unrelated to the GSM City and Supercenter investigation does not undermine the government's report to the Puerto Rico grand jury that Calderón received ten cash deliveries during the course of the investigation. Likewise, the misattribution of one or more of the money drops to a police officer rather than a confidential informant in the Florida grand jury proceeding does not call into question the integrity of the Puerto Rico indictment, which charged Calderón with falsely stating that he had never received cash. In sum, the grand jury proceedings provide no basis for upending Calderón's prosecution and conviction.

Given the lack of merit in Calderón's challenge to the indictment, the district court did not err in refusing to order production of a transcript of the sealed grand jury proceedings. See United States v. Sells Eng'g, Inc., 463 U.S. 418, 424 (1983) (recognizing the "long-established policy that maintains the

- 21 -

secrecy of the grand jury proceedings in the federal courts" (quoting <u>United States</u> v. <u>Proctor & Gamble Co.</u>, 356 U.S. 677, 681 (1958))); <u>United States</u> v. <u>Capozzi</u>, 486 F.3d 711, 727 (1st Cir. 2007) (holding that "[t]he 'indispensable secrecy of grand jury proceedings' must not be broken except where there is a compelling necessity[,]" and stating that the defendant bears the burden of showing "particularized need" (quoting <u>Proctor & Gamble Co.</u>, 356 U.S. at 682)).[11]

For the foregoing reasons, the judgment of the district court is affirmed.

<u>So ordered.</u>

---

[11] The government provided an unsealed summary of the Puerto Rico grand jury proceedings and offered to make the full transcript available to the court for <u>in camera</u> inspection. The court did not request such an inspection.