# United States Court of Appeals
## For the First Circuit

No. 19-2098

UNITED STATES OF AMERICA,

Appellee,

v.

OSCAR J. MARTÍNEZ-HERNÁNDEZ, a/k/a "Cali,"

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Barron, Chief Judge,
Lipez and Montecalvo, Circuit Judges.

Rafael F. Castro Lang for appellant.

David C. Bornstein, Assistant United States Attorney, with
whom W. Stephen Muldrow, United States Attorney, and Mariana E.
Bauzá-Almonte, Assistant United States Attorney, Chief, Appellate
Division, were on brief for appellee.

September 24, 2024

**LIPEZ**, **Circuit Judge**.  This case stems from the murder of a correctional officer, Osvaldo Albarati, who was shot to death in February 2013 while he was driving home from the federal prison where he worked.  Appellant Oscar Martínez-Hernández was convicted and sentenced to life imprisonment for his leadership role -- as an inmate -- in arranging Albarati's killing.  On appeal, Martínez-Hernández argues that his conviction must be vacated because his indictment was flawed and multiple errors at trial resulted in violations of his Fifth and Sixth Amendment rights.  Only one issue is difficult: an asserted Brady violation based on the government's failure to timely produce a missing prison logbook.  See Brady v. Maryland, 373 U.S. 83, 87 (1963).

Ultimately, however, we conclude that any such violation does not warrant a new trial.  When the record is considered as a whole, the logbook content does not undermine the overwhelming evidence of Martínez-Hernández's guilt.  See, e.g., Turner v. United States, 582 U.S. 313, 324-25 (2017) (emphasizing that withheld evidence must be "material" to establish a Brady violation).  The district court therefore did not abuse its discretion in finding that Martínez-Hernández failed to show "a 'reasonable probability' of a different outcome if the government had disclosed the evidence prior to trial."  United States v. Calderón, 829 F.3d 84, 90 (1st Cir. 2016) (quoting United States v. Flores-Rivera, 787 F.3d 1, 15-16 (1st Cir. 2015)).  Because we

find no merit in any of the other assertions of error, we affirm Martínez-Hernández's conviction and the district court's denial of his motion for new trial.

## I.  Background

The trial in this case spanned twelve days in September 2018 and featured twenty government witnesses, including inmates and correctional officers at MDC Guaynabo (a federal detention center in Guaynabo, Puerto Rico), and two charged coconspirators. The defense presented two witnesses: a prison official and an inmate detained at MDC Guaynabo.  We provide details of the relevant testimony below in discussing Martínez-Hernández's challenges to the sufficiency of the evidence.  We think it helpful, however, to first summarize the government's theory of prosecution and Martínez-Hernández's primary defenses to that theory.

The government sought to prove that Martínez-Hernández, together with a fellow inmate at MDC Guaynabo, planned Albarati's killing because of the officer's persistent efforts to uncover and confiscate contraband possessed by the inmates, most notably highly valuable cellphones.  Albarati was part of the Special Investigative Services ("SIS"), a six-member team of guards whose mission -- according to the officer who led the unit at that time -- was to "clean[] up MDC [Guaynabo] from the huge wave of cell phones and other contraband."  The government depicted

- 3 -

Martínez-Hernández -- known as "Cali" within the prison -- as a powerful inmate with substantial resources who hired other inmates to perform various tasks for him. He reportedly paid others, for example, to clean his cell, provide security, cook for him, and shield him from punishment when prison guards inspected his cell for contraband.

According to the government's witnesses, Martínez-Hernández plotted Albarati's murder with inmate Ángel Ramos-Cruz -- known as "Api" -- who contracted with associates outside the prison to commit the crime. Martínez-Hernández's alleged role included helping to pay for the hired guns and communicating to Ramos-Cruz when Albarati left work on the night of the murder so that Ramos-Cruz could alert the hitmen, who followed Albarati from the prison, drove up beside him on the highway, and shot him to death using automatic pistols.

Martínez-Hernández contends that much of the government's evidence -- primarily the testimony of the other inmates at MDC Guaynabo -- was fabricated or inadmissible as hearsay. He claims that, because the prosecutors knew they had no evidence implicating him in the murder, they "opted to manipulate evidence to wrongly accuse him of a crime he did not commit." In the defense's opening statement and closing arguments at trial, Martínez-Hernández's attorneys placed the blame for the murder on Ramos-Cruz and his "gang" and emphasized that Martínez-Hernández

- 4 -

was "wholly unconnected by any evidence" to the individuals outside the prison who committed the murder. Martínez-Hernández repeated that theme in his motion for new trial, describing the case against him as "entirely circumstantial" and complaining that authorities "overlook[ed] others with genuine, substantial motives and, in one case, prior criminal association with [Ramos-Cruz] and the gang of shooters who indisputably carried" out the murder of Albarati.[1]

On appeal, Martínez-Hernández further insists that Albarati was killed for reasons other than his official duties, and he asserts that the prison logbook that was not made available until after the close of evidence shows that the "shakedown" that supposedly precipitated the murder did not happen.[2]

---

[1] We note that the district court denied a defense request to present an "alternative perpetrator defense" because the evidence offered to show a separate conspiracy involving actors unrelated to Martínez-Hernández was speculative. The court explained that such a theory requires "particular evidence" pointing to a third party. See United States v. Patrick, 248 F.3d 11, 21 (1st Cir. 2001) (stating that evidence concerning an alternative perpetrator is relevant if it shows "a connection between the other perpetrator and the crime, and not mere speculation"); see also Holmes v. South Carolina, 547 U.S. 319, 327 (2006). However, as the district court also explained, its rejection of the alternative perpetrator defense did not foreclose counsel's efforts to create reasonable doubt about Martínez-Hernández's guilt by emphasizing to the jury any admitted evidence consistent with other individuals' possible culpability. Martínez-Hernández does not challenge the court's alternative perpetrator ruling in this appeal.

[2] The term "shakedown," which, among other meanings, is defined as "a thorough search," Shakedown, Merriam-Webster Online Dictionary, https://perma.cc/MZK2-M4Z8 (captured Sept. 23, 2024), is commonly used to describe a search for contraband inside a prison, see, e.g., Hudson v. Palmer, 468 U.S. 517, 519 (1984). In

Martínez-Hernández claims that the logbook "would have destroyed the credibility of the [g]overnment's witnesses."

The government charged Martínez-Hernández, Ramos-Cruz, and seven others[3] with six counts alleging, inter alia, that they conspired to murder Albarati on account of his performance of his official duties. See 18 U.S.C. §§ 2, 1111, 1114, 1117.[4] On appeal, Martínez-Hernández raises five claims: (1) the evidence was insufficient to support his conviction on any of the six counts; (2) the district court erred in denying his motion for new trial, which was based on the government's improper withholding of the shakedown logbook; (3) the district court improperly admitted

_____

his motion for new trial, Martínez-Hernández described shakedown logs as "bound books in which a handwritten contemporaneous record of searches conducted in a housing unit are recorded in chronological order, cell by cell or area by area."

[3] All eight of the coconspirators charged alongside Martínez-Hernández pleaded guilty pursuant to plea agreements, while Martínez-Hernández proceeded to trial. Three of the nine total conspirators were inmates at MDC Guaynabo and six were outside the prison. Three of the outside coconspirators were identified as the driver and gunmen directly responsible for Albarati's killing.

[4] The federal indictment charged the nine coconspirators with: (1) aiding and abetting the murder of "an officer and employee of the United States[] while [he] was engaged in and on account of the performance of his official duties" (Count One); (2) conspiracy to commit that murder (Count Two); (3) aiding and abetting a murder for hire (Count Three); (4) conspiracy to commit a murder for hire (Count Four); (5) aiding and abetting the use of a firearm in relation to the murder charged in Count One (Count Five); and (6) aiding and abetting the use of a firearm in relation to a murder for hire (Count Six).

hearsay statements under the coconspirator exception without sufficient extrinsic evidence that a conspiracy existed and where the statements were not made in furtherance of the conspiracy; (4) the district court erred in denying his pretrial motion to dismiss the indictment, in which he accused the government of misconduct in securing the indictment; and (5) a new trial should be ordered under the cumulative-error doctrine. We consider each of these contentions in turn.

## II. Sufficiency of the Evidence

### A. Standard of Review

We ordinarily review preserved sufficiency claims de novo, taking the evidence in the light most favorable to the verdict. United States v. Orlandella, 96 F.4th 71, 84 (1st Cir. 2024). However, when a defendant seeks a new trial under Federal Rule of Criminal Procedure 29 by identifying specific gaps in the evidence, rather than making "a general challenge to the adequacy of the evidence," any grounds raised on appeal that were not specified in the district court "are considered waived and are reviewed under [a] less forgiving 'clear and gross injustice' standard." United States v. Marston, 694 F.3d 131, 134 (1st Cir. 2012) (quoting United States v. Upham, 168 F.3d 532, 537 (1st Cir. 1999)); see also, e.g., United States v. Facteau, 89 F.4th 1, 39 n.26 (1st Cir. 2023).

The government argues that the "clear and gross

injustice" standard applies because the evidentiary deficiencies Martínez-Hernández raises on appeal were not raised in the district court. It contends that defense counsel's "lengthy oral Rule 29 motion raise[d] only specific challenges" that "cannot be reasonably construed as mere 'examples' accompanying a general objection." Appellee's Br. at 37 (quoting United States v. Morel, 885 F.3d 17, 22 (1st Cir. 2018)). Martínez-Hernández disputes the government's narrow interpretation of his sufficiency argument to the district court and asserts that defense counsel simply provided specific examples after making a general objection -- an approach we have endorsed and, indeed, encouraged. See Marston, 694 F.3d at 135 (finding "good reason in case of doubt" to characterize such a belt-and-suspenders approach as a general objection because "[i]t is helpful to the trial judge to have specific concerns explained even where a general motion is made").

We think there is enough ambiguity in the record to give Martínez-Hernández the benefit of the doubt with respect to most of his arguments on appeal. Defense counsel introduced the Rule 29 motion with the following statement: "On behalf of Mr. Martínez-Hernández, the defense argues that there was a failure of proof of essential elements in, I believe, each of the charges but I'm going to go one by one." Counsel then reviewed each count and identified specific evidentiary gaps. Counsel's initial remark could be construed as a statement that

Martínez-Hernández was challenging the proof of discrete elements for each charge, which she was about to describe one-by-one. But the statement also can be taken as a more general complaint that the evidence for each count was lacking and that counsel would be setting forth examples of the deficiencies on a count-by-count basis.

In any event, as we detail below, treating Martínez-Hernández's sufficiency claims generously does not affect their outcome because, even under de novo review, the record supports the jury's verdict on each count. We decline, however, to indulge one newly advanced sufficiency argument with that favorable standard. Unlike most of Martínez-Hernández's claims, which focus on the content of witness testimony, Martínez-Hernández's challenge to the two murder-for-hire counts includes a legal argument concerning the scope of the interstate commerce element of the relevant statute, 18 U.S.C. § 1958. But Martínez-Hernández cites no precedent to support his view of the statute and offers no other legal analysis. See infra Section II.D. Given that lack of development, along with the failure to raise the issue in the district court, we consider that argument under the "less forgiving 'clear and gross injustice' standard." Marston, 694 F.3d at 134 (quoting Upham, 168 F.3d at 537).[5]

---

[5] We add one further note about our review. Although we conclude that Martínez-Hernández should not be denied de novo

In reviewing the record to evaluate Martínez-Hernández's sufficiency claims, "we consider all the evidence offered by the government that was admitted by the court, 'even if the court erroneously admitted some of that evidence.'" United States v. Santiago-González, 825 F.3d 41, 46 (1st Cir. 2016) (quoting United States v. Ramírez-Rivera, 800 F.3d 1, 16 (1st Cir. 2015)); see also Lockhart v. Nelson, 488 U.S. 33, 41-42 (1988) (stating that a reviewing court must consider the "same quantum of evidence" as the trial court, which "considers all of the evidence it has admitted" when "passing on [a Rule 29] motion"). Hence, Martínez-Hernández's hearsay-based challenge to certain testimony, which we address below, is irrelevant to our sufficiency inquiry. See United States v. Acevedo, 882 F.3d 251, 258 & n.7 (1st Cir. 2018) (rejecting appellant's "contention that we must ignore, or discount the weight to be given, certain evidence in evaluating his challenge to the denial of his Rule 29 motion due to the errors that he alleges" were made in admitting that evidence). Nor do we consider in our sufficiency assessment any evidence related to the asserted Brady claim -- i.e., evidence that the jury did not hear. That issue also will be discussed separately below.

_____

review for most of his sufficiency claims based on how he articulated his objections in the district court, that conclusion does not insulate those claims from waiver or forfeiture on other grounds. As we describe below, his challenges to the conspiracy and firearms counts are waived for different reasons.

We thus turn to Martínez-Hernández's sufficiency challenges to the six counts on which he was found guilty.

**B. Count One: Murder of a federal officer and employee, 18 U.S.C. § 1114(a).**

Martínez-Hernández argues that the evidence was insufficient to show that Albarati's killing was "on account of the performance of [his] official duties," a finding required to support his conviction for aiding and abetting the murder under 18 U.S.C. § 1114(a). As the government points out, however, Martínez-Hernández's argument turns on a depiction of the evidence "most favorable to him rather than to the government," contrary to the standard applicable to sufficiency challenges. United States v. Freitas, 904 F.3d 11, 23 (1st Cir. 2018). Moreover, he also relies on evidence that was not presented to the jury -- including testimony given before the grand jury and FBI reports that were not admitted at trial.[6]

The evidence that was before the jury amply supported a finding that Albarati was killed because of his relentless pursuit of contraband and his particularly close monitoring of

_____

[6] For example, without citation to the record, Martínez-Hernández reports that Jancarlos Velázquez-Vázquez, an indicted coconspirator outside the prison, stated that inmates wanted to kill Albarati because, among other reasons, he "would look at their women and say fresh things to them." With record citation, the government responds that this testimony was given only before the grand jury and not at trial.

- 11 -

Martínez-Hernández, who was in the business of obtaining and selling cellphones and other unlawfully procured items within the prison.[7] The head of the SIS unit, Lieutenant José Rosa, testified that Albarati never found contraband in Martínez-Hernández's cell -- consistent with the evidence that other inmates protected Martínez-Hernández by hiding items or taking the blame themselves[8] -- "but he looked a lot."

One inmate, Christopher Gil-Rodriguez, similarly testified that Albarati "[f]requently" conducted "[r]ough" shakedowns in Martínez-Hernández's cell in Unit 2-B of the prison. A second inmate, Rosario-Santiago, testified that Albarati started coming to Unit 2-B more often after Martínez-Hernández was placed there, in December 2012.[9] Gil-Rodriguez and Rosario-Santiago both described one encounter on December 31, 2012, when the inmates in the unit were having a party, and using drugs and cellphones,

---

[7] Martínez-Hernández focuses solely on the motive for the killing in his sufficiency challenge to Count One, so we do the same here.

[8] One inmate, Luis Joel Rosario-Santiago, testified that he had never seen Albarati seize contraband from Martínez-Hernández because, "if the lieutenant was coming [Martínez-Hernández] would pass to [the inmates working for him] whatever he had in his hands," and they would take the blame.

[9] Martínez-Hernández was housed in Unit 2-B from December 17, 2012 until February 27, 2013. He arrived at MDC Guaynabo in January 2012 and previously had been housed in Unit 4-B. He was in the prison's Special Housing Unit from November 13, 2012 until he was moved to Unit 2-B on December 17.

before Albarati appeared "all of a sudden" and "everybody disappeared." Gil-Rodriguez reported that no contraband was found on Martínez-Hernández because others had taken it from him.[10] According to Gil-Rodriguez, Albarati approached Martínez-Hernández that night and "told him that[,] ever since he was in Unit 2-B[,] he's the one who was leading 2-B." In response, Martínez-Hernández instructed the officer "not to be disrespectful to him because it wasn't just 2-B, it was the entire building."

Ramos-Cruz, the inmate with whom Martínez-Hernández allegedly coordinated Albarati's murder, arrived in Unit 2-B in early 2013. According to Gil-Rodriguez, Ramos-Cruz appeared to have a prior relationship with Martínez-Hernández, and the two men interacted "as if they'd known each other for some time and they had a friendship." Gil-Rodriguez, who was Ramos-Cruz's cellmate,[11] testified that he heard Martínez-Hernández and Ramos-Cruz plan to kill Albarati, and he said the pair's motivation was to make "the other guards . . . show a lot more respect to the inmates." Later

---

[10] Gil-Rodriguez specifically testified that Martínez-Hernández had no contraband "because they had already taken it away." When asked "[w]ho," he responded, "Barriga" -- evidently referring to another inmate.

[11] Gil-Rodriguez reported that, upon Ramos-Cruz's arrival in the unit, Martínez-Hernández instructed him to take Ramos-Cruz to his (Gil-Rodriguez's) cell, where "[o]nly people of trust" could live because it contained a hidden compartment where Martínez-Hernández stored cellphones.

in his testimony, when asked what happened in the prison unit that led to Albarati's murder, Gil-Rodriguez responded "[t]he searches that Lieutenant Albarati did."[12]

Coconspirator Velázquez-Vázquez similarly gave testimony linking the murder to Albarati's treatment of the inmates. Velázquez-Vázquez testified that he heard that Ramos-Cruz was planning to murder Albarati "[t]wo or three months before" the killing because Albarati "had some sort of persecution against [Ramos-Cruz and other inmates]." But, according to Velázquez-Vázquez, the coconspirator who told him of Ramos-Cruz's intention to kill Albarati "ignored [Ramos-Cruz] because [Ramos-Cruz] did not have enough money to carry out a murder of that caliber" -- i.e., the murder of an officer. Later on, however -- "[a]t the most two weeks before the murder" -- the plan moved forward because Martínez-Hernández would provide the funds.[13] Velázquez-Vázquez confirmed at trial that he told the FBI in 2014 that Martínez-Hernández wanted to kill Albarati because the officer was "disrespecting" him.

Both Gil-Rodriguez and Rosario-Santiago testified about

_____

[12] Gil-Rodriguez gave this response during testimony describing searches that he said occurred on February 26, the day of Albarati's murder. See infra. It thus appears that his comment was referring to those specific searches.

[13] Velázquez-Vázquez testified that an individual known as Cheo Silva "would be the grantor" and "would guarantee [that] the money would be paid . . . [by] Cali."

an episode they said occurred on the afternoon of February 26, the day of Albarati's murder. Rosario-Santiago stated that Albarati and another officer entered Unit 2-B, and Albarati first went into Martínez-Hernández's cell and then into Ramos-Cruz's cell. Nothing was found in Martínez-Hernández's cell, but after some synthetic marijuana was found in Ramos-Cruz's cell, the officers seized more than $1,000 worth of commissary items from him. During the encounter, Ramos-Cruz argued with Albarati, and after Albarati left, Ramos-Cruz went to Martínez-Hernández's cell. Gil-Rodriguez said the two alleged conspirators "were mad" and "upset" about Albarati's searches, and they decided to put the plan to murder Albarati into action.

An inmate who worked for Martínez-Hernández within the prison, Yassel Díaz-Santana, testified about a hostile interaction between Martínez-Hernández and Albarati on an earlier occasion. Díaz-Santana reported hearing Martínez-Hernández call Albarati a "pig," followed by Albarati announcing to "everybody" within hearing distance that "Cali is my snitch and he's the one who gives me the phones." In response, according to Díaz-Santana, Martínez-Hernández "got mad and he yelled at [Albarati], 'I'm going to have you killed.'" Díaz-Santana also testified that Martínez-Hernández had once offered him $20,000 to harm another correctional officer -- "[h]e wanted for his head to be split, broken" -- because officers had "ripped up a picture" belonging to Martínez-Hernández

during a shakedown in his cell.

Martínez-Hernández disputes the veracity of much of this evidence. He questions, for example, whether Díaz-Santana could have heard Martínez-Hernández say he would kill Albarati when, at the relevant time, the two men were in separate cells in the prison's Special Housing Unit. He also disputes the testimony that Albarati entered his and Ramos-Cruz's cells on the day of the murder and, hence, claims that Gil-Rodriguez necessarily testified falsely when he said that "[t]he searches that Lieutenant Albarati did" precipitated the killing that night.

But these and Martínez-Hernández's other challenges to testimony offered by the government to support the six counts of conviction are unavailing on appeal. Assessing the credibility of the witnesses was the role of the jury, see United States v. Stewart-Carrasquillo, 997 F.3d 408, 420 (1st Cir. 2021), and the jurors were well informed about the defense's veracity concerns surrounding the testimony of the government's witnesses. Through cross-examination, defense counsel challenged the memories and inconsistent accounts of some witnesses, and also elicited the possible motivation of multiple witnesses to give testimony favoring the government to avoid indictment or to obtain sentencing benefits.[14] In addition, the district court instructed the jurors

_____

[14] As described above, Gil-Rodriguez's testimony was particularly harmful to Martínez-Hernández, and defense counsel

that they should consider the testimony of "witnesses and accomplices, with plea bargains or otherwise . . . with particular caution."  Such a witness, the court explained, "may have had reason to make up stories or exaggerate what others did because he wants to help himself."[15]

It was thus the jury's province, for example, to accept or reject Díaz-Santana's testimony that he could hear the conversation between Albarati and Martínez-Hernández from his

---

extensively questioned him about inconsistences between his testimony at trial and his testimony before the grand jury. Counsel observed, in front of the jury, that Gil-Rodriguez's trial testimony included "a lot more information about this murder than [he] provided before," and that, "as time has passed to the present [his] story has become more focused and more particular upon Mr. Martínez-Hernández."  Defense counsel also elicited Gil-Rodriguez's admission that he had committed a murder in 2011, among other criminal activities, and pressed him about his expectations for a reduced sentence in exchange for his cooperation.  The defense conducted similarly lengthy cross-examination of coconspirator Veláquez-Vázquez, another critical witness, who admitted during his direct testimony that he was the driver for seven or eight murders and, in addition, twice "pull[ed] the trigger."

[15] The court elaborated as follows:

> You must determine whether the testimony of such a witness has been affected by any interest in the outcome of this case, any prejudice for or against Mr. Martínez-Hernández, or by any benefit or benefits he, the witness, may receive from the government as a result of the plea agreement. You may consider the witness's guilty plea, if the witness has pled guilty in this or another case, in assessing his credibility, but you're not to consider their guilty pleas as evidence of [Martínez-Hernández's guilt] in any way.

location three cells away in the Special Housing Unit.  Similarly, Martínez-Hernández's attempt to rebut on appeal the testimony that shakedowns in Martínez-Hernández's and Ramos-Cruz's cells occurred on the afternoon preceding the murder -- which Gil-Rodríguez said angered the two men -- is fruitless.  In arguing that the testimony is false, Martínez-Hernández relies primarily on the shakedown logbook that was not introduced at trial, asserting that it shows no such activity.  The logbook, however, is outside the scope of our sufficiency review, which is necessarily limited to the "same quantum of evidence" considered by the jury.  Lockhart, 488 U.S. at 42.

In sum, the evidence heard by the jury was more than sufficient to support a finding beyond a reasonable doubt that Martínez-Hernández aided and abetted Albarati's murder because of the officer's performance of his official duties.

## C. Count Two: Conspiracy to commit the murder charged in Count One, 18 U.S.C. § 1117

In challenging the sufficiency of the evidence for the Count Two conspiracy conviction, Martínez-Hernández offers a spectrum of arguments that includes the improper admission of hearsay statements and what he claims is the government's "illogical, irrational" theory that Ramos-Cruz served as an intermediary between him and the shooters.  That theory was flawed, according to Martínez-Hernández, because he "had a cellular phone

of his own and did not need Api to [relay] messages to the outside community."  Martínez-Hernández also claims the properly admitted evidence shows no more than his mere awareness of the crime.

None of these contentions has weight.  Before explaining why, however, we note that we could treat the sufficiency arguments on both conspiracy counts -- Counts Two and Four -- as waived.  As the government points out, in arguing Martínez-Hernández's Rule 29 motion, defense counsel expressly conceded that the conspiracy counts presented "largely a question of credibility" that should go to the jury.  Although we therefore could bypass the merits of Counts Two and Four, we nonetheless respond briefly to Martínez-Hernández's three arguments set forth above concerning the charge that he conspired to murder Albarati on account of his official duties.

First, as we have explained, any hearsay problem with the admitted evidence is not relevant to a sufficiency review.  See supra.  Second, the government's theory concerning Ramos-Cruz's role as an intermediary with the shooters was based on the not "illogical" or "irrational" fact that Ramos-Cruz had access to hitmen outside the prison, not his possession of a cellphone.  Third, contrary to Martínez-Hernández's "mere awareness" assertion, the government offered testimony that not only indicated Martínez-Hernández's primary role in planning the murder but also that he took multiple overt acts in furtherance of

the conspiracy.

Gil-Rodriguez testified that, as they had planned, Martínez-Hernández signaled to him when Albarati drove away from the prison on February 26,[16] and Gil-Rodriguez then signaled to Ramos-Cruz, who alerted the shooters by phone. Rosario-Santiago, whose cell was directly below Martínez-Hernández's, testified that Ramos-Cruz came to his cell that day and asked to look out his window. When Rosario-Santiago asked what he was looking for outside, Ramos-Cruz answered, "You'll see what happens." Later the same day, another inmate, José Costoso (known as "Magnolia"), spent time looking out the window of Rosario-Santiago's cell and said that Martínez-Hernández had "told [Magnolia] to watch the white Veloster" -- i.e., Albarati's car.[17] After Magnolia stopped looking out the window, he spoke to Martínez-Hernández through a conduit that ran between cells and reported that "[h]e left already."

Perhaps most significantly, multiple witnesses testified that Martínez-Hernández helped to finance the crime. Gil-Rodriguez testified that Martínez-Hernández agreed to pay, and

---

[16] The government introduced evidence that one staff parking lot could be viewed from inside Martínez-Hernández's cell.

[17] We note that, although Martínez-Hernández had a view of a staff parking lot from his own cell, the defense pointed out in closing arguments that his window afforded him only a partial view of the lot.

later paid, $40,000 for the murder. Velázquez-Vázquez testified that the money for the murder was expected to come from "Cali." Díaz-Santana reported a telephone conversation he overheard on the day of the murder in which Martínez-Hernández said "the man" was "falling today." When the person on the other end ("El Gordo Irizarry") then asked, "How are we going to split the pie," Martínez-Hernández answered, "Write me down for 50." And another inmate witness, Jorge Asencio-Viera, testified that he was told that Martínez-Hernández was among three persons -- with Ramos-Cruz also part of the trio -- who were collecting money to pay for Albarati's murder.

This evidence, if believed by the jury, together with the evidence described above in Section B, was more than sufficient to establish Martínez-Hernández's participation in a conspiracy to murder Albarati "on account of the performance of [his] official duties." 18 U.S.C. § 1114(a). As Martínez-Hernández acknowledged, it was up to the jury to evaluate the credibility of the witnesses' testimony in determining whether the government had proven Martínez-Hernández's guilt beyond a reasonable doubt.

**D. Counts Three and Four: Aiding and abetting a murder for hire and the related conspiracy count, 18 U.S.C. §§ 1958, 2.**

In his sufficiency challenge to the two murder-for-hire counts, Martínez-Hernández primarily relies on the same arguments about the inadequacy of the evidence that he asserted for Counts

One and Two -- with the additional contention that the government failed to prove the interstate commerce element of the crimes.  In relevant part, the statute underlying Counts Three and Four criminalizes using, or causing another to use, "any facility of interstate or foreign commerce, with intent that a murder be committed . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so."  18 U.S.C. § 1958(a).  The government relied on the vehicle used by the gunmen -- a Toyota Yaris -- as the facility of interstate commerce.

We need not repeat the evidence recited above concerning Martínez-Hernández's participation in the murder plot, which included evidence of payments promised, and later paid, for Albarati's murder.  We therefore address here only his argument challenging the adequacy of the interstate-commerce showing.[18] Martínez-Hernández summarily asserts, without citation, that the government's proof was lacking because the evidence showed only that the vehicle was purchased "at some undisclosed time" in "a regular business deal" and not "for the purpose of committing Lt. Albarati's murder."[19]  He appears to contend that the

---

[18] And, of course, as discussed above, Martínez-Hernández conceded that the conspiracy count was for the jury.

[19] At trial, the government established that the Toyota Yaris necessarily had traveled in interstate commerce because "no automobiles are manufactured" in Puerto Rico.

government needed to show either that the car was brought to Puerto Rico to further the murder plan or that its use in the murder affected interstate commerce.

As explained above, Martínez-Hernández may succeed with this challenge to his conviction under § 1958(a) only if he shows "an 'egregious misapplication of legal principles,'" United States v. Charriez-Rolón, 923 F.3d 45, 51 (1st Cir. 2019) (quoting United States v. Greenleaf, 692 F.2d 182, 186 (1st Cir. 1982)), constituting "a 'clear and gross injustice,'" id. (quoting United States v. Ponzo, 853 F.3d 558, 580 (1st Cir. 2017)). Martínez-Hernández has not even attempted to meet that standard. He cites no authority in support of his contention that the government needed to show that the car was brought to Puerto Rico to further the murder plan. Moreover, he does not develop that argument beyond making a conclusory statement. Indeed, as we have recognized, "it is enough that the . . . use of interstate facilities makes easier or facilitates the unlawful activity," and "there is no requirement that each accused use a facility in interstate commerce, or that each accused intend such a facility to be used, or even that each accused know that such a facility probably will be used." United States v. Houlihan, 92 F.3d 1271, 1292 (1st Cir. 1996) (omission in original) (quoting United States v. Arruda, 715 F.2d 671, 682 (1st Cir. 1983)); see also United States v. Mandel, 647 F.3d 710, 720-21 (7th Cir. 2011) (holding

- 23 -

that there was no "plain error" of law in a decision that upheld "the intrastate use of a personal automobile" in a murder for-hire plot as the basis for a federal charge under § 1958(b)(2)).

**E. Counts Five and Six: Aiding and abetting the use of a firearm in relation to the murder and in relation to a murder for hire, 18 U.S.C. §§ 924(c)(1)(A), 924(j)(1), 2.**

As the government points out, Martínez-Hernández makes no developed challenge to the two firearms counts in his opening brief. In his reply brief, he explains that he did not argue error for Counts Five and Six "because if this Court finds that he did not commit the charges under Count One through Four, then Counts Five and Six are academic." Martínez-Hernández thus effectively acknowledges that he waived any independent challenge to Counts Five and Six. See, e.g., United States v. Rodríguez-Rosado, 909 F.3d 472, 479 n.9 (1st Cir. 2018) (finding waiver where appellant referred to a claimed error in his "Summary of the Argument," but did not subsequently develop the claim). Moreover, the record amply supports the jury's finding that Martínez-Hernández knew that a firearm would be used to murder Albarati.

### III. The Brady Violation

#### A. Factual Background

Early in the pre-trial phase of the case, in 2015, the defense requested all "[h]ousing [u]nit shakedown [l]ogs or records" from MDC Guaynabo for the years 2008 through 2013. Although most of the requested records apparently were ultimately

- 24 -

provided, the logbook for the unit where Martínez-Hernández was housed from mid-December 2012 through February 27, 2013 -- the day after Albarati's murder -- could not be located by the Bureau of Prisons ("BOP"). After multiple pre-trial requests for all unit logbooks, the BOP reported in June 2018, about two months before trial, that the Unit 2-B logbook still had not been found despite "[e]fforts . . . made to locate the files in the institution." The BOP memorandum stated that efforts to locate the logbook at the prison would continue.[20]

During cross-examination at trial, former SIS Lieutenant José Rodriguez described the measures taken "to safekeep unit logs at MDC Guaynabo so they don't go missing," which included placing not-yet-full logbooks in an office, "[u]nder lock and key," at the end of each day. When defense counsel asked how it was "possible for a unit log[] as important as [the Unit 2-B logbook] to be missing," the government objected to the question as speculative. In response to a follow-up question from the court, Rodriguez said that he was in fact unaware that the logbook could not be located. Upon further questioning from defense counsel, Rodriguez stated that logbooks "very seldom" went missing.

After the prosecution and defense rested their cases at

---

[20] The June 2018 memorandum also addressed a second missing logbook -- for a different housing unit -- that is not at issue here.

trial, the defense requested a spoliation instruction advising the jurors that they may infer that the missing logbook contained evidence that was "unfavorable to the government." The court initially denied the request because no evidence had been presented about the logbook's status during the trial. The next day, after the defense sought to reopen the evidence to lay a foundation for the spoliation instruction, a colloquy ensued in which the government reported that the logbook had been found in the Office of the Inspector General ("OIG") in Washington, D.C. A short time later, the government informed the court that the logbook was actually in Miami.

While the government made efforts to have the logbook pages scanned and sent to Puerto Rico, the court and parties continued a discussion begun earlier about how to proceed with respect to the logbook's still unknown contents. The defense reiterated its request for a spoliation instruction, and, with the government's acquiescence, the court ultimately agreed to give one -- subject to any different approach that might be appropriate if the parties obtained the logbook in the next few hours. The court also told defense counsel that they were not "waiving the right to examine that logbook" and, if it turned out post-verdict that "this logbook would have, under the prevailing standard, . . . changed the result if there's a conviction, then we will have to have a new trial."

Later the same day, just before the jury was to be instructed, the court and parties learned that the logbook in OIG's possession was not the right one. The court issued an order directing the government to immediately produce the actual logbook "if and when found," and the court again noted the possibility that the logbook's contents could give rise to a Brady claim "at any point, i[t] could be five years from now." But because the government had not yet turned over the logbook, the court gave the jury an adverse-inference instruction. The court told the jury that it "may use [the fact that the logbook was not located] to infer, but do not have to, that the logbook and the information therein would have been useful to Mr. Martínez[-]Hernández in presenting [his] case." After completing its jury instructions, the court adjourned for the day.

The next morning, when the parties arrived for closing arguments, the court reported that the correct logbook had "appeared" and was in its possession.[21] Asked if the defense was nonetheless ready to proceed with closing, counsel responded "[a]bsolutely." The court reiterated that "of course you're not waiving any arguments that you may have following a verdict once

---

[21] The government later reported that, after the court entered its order, a prison employee "undertook to look again for the Shakedown Log" and found it "in a locked compartment within MDC of a former BOP supervisory official."

- 27 -

you examine the logbook."[22]   The prosecution and defense then presented their closing arguments, and the trial concluded with the jury's guilty verdicts on all counts.

Roughly two months later, after reviewing the Unit 2-B logbook, the defense moved for a new trial based on Federal Rule of Criminal Procedure 33 and <u>Brady</u> v. <u>Maryland</u>, accusing the government of deliberately withholding "material exculpatory

---

[22] The colloquy included the following exchange:

> **COURT**: At some point, depending on what the outcome of the verdict is, we will have to have further discussions regarding this; but I think if you're ready at this time to proceed to the closings -- again, you're not waiving any arguments that you can possibly have on behalf of your client regarding that shakedown logbook.  And I think we can proceed.
> **[DEFENSE]**: Your Honor, what we discussed yesterday is that we would have the [spoliation] instruction, which was given to the jury, and we reserved all rights to request a new trial whether there appears to be Brady type of information in that log.  We have a full reservation of rights --
> **COURT**: You can request a new trial, dismissal, anything right now.  It hasn't been presented, but what I want to make clear is that the defense is not waiving -- again, you have not seen this so anything that comes up after seeing this we'll have to discuss it at the appropriate time.
> **[DEFENSE]**: We're not going to look at the log now, Your Honor.  I think the time for that is long passed and we'd like to do our closings and submit this to the jury.

evidence."[23]   The motion identified two aspects of the logbook as particularly significant:  (1) it did not include in its chronological list of contraband searches the shakedowns of Ramos-Cruz's and Martínez-Hernández's cells on the day of Albarati's murder, contrary to the testimony of four witnesses,[24] and (2) it did not show a dramatic increase in shakedowns in Unit

---

[23] Rule 33 allows a court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Martínez-Hernández's Rule 33 claim was "grounded on newly discovered evidence."  Fed. R. Crim. P. 33(b)(1).  In Brady, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. at 87.  In Giglio v. United States, 405 U.S. 150, 154 (1972), the Supreme Court applied the disclosure obligation to "information potentially useful in impeaching government witnesses."  United States v. Misla-Aldarondo, 478 F.3d 52, 63 (1st Cir. 2007).

A Brady claim premised on the government's belated production of evidence -- i.e., the defense's receipt of new evidence from the government -- also falls under Rule 33(b).  See generally United States v. Peake, 874 F.3d 65, 69-70 (1st Cir. 2017). However, a defendant who seeks a new trial based on newly discovered evidence outside the Brady context must satisfy a more demanding standard of prejudice.  See id. at 69.  Because Martínez-Hernández has asserted a colorable Brady claim, we consider his "newly discovered evidence" claim solely under the Brady framework, which we describe below.

[24] In addition to the testimony of inmates Gil-Rodriguez and Rosario-Santiago described in Section II.B, Martínez-Hernández cites the testimony of former SIS Lieutenants José Rosa and José Rodriguez.  Rosa testified that he instructed Albarati to search Martínez-Hernández's cell that night based on a tip that he had drugs and a cellphone, and Rosa further testified that Albarati later reported finding no contraband in the cell.  Rodriguez testified that, at about 9:30 or 10 PM that night, "information was passed on to Lieutenant Albarati to conduct a shakedown" in Martínez-Hernández's cell.

2-B after Martínez-Hernández arrived there -- information that, according to the defense, also conflicted with witness testimony. In the motion, Martínez-Hernández asserted that "[t]he Unit 2-B Shakedown Log was of critical importance because it reflected the searches of [appellant's] living unit for the two months leading up to the night of the murder," and he emphasized that the logbook "contradicted not one, but four major witnesses who provided the same false narrative about a critical event" -- i.e., the February 26 shakedowns.

In its written response to the motion, the government stated that -- consistent with evidence presented at trial, see infra -- shakedowns performed by MDC Guaynabo's special investigations officers, including Albarati, would not have been documented in the Unit 2-B logbook but would have been recorded separately, in the SIS's "TrueView" system. As for the defense claim about the frequency of shakedowns in Martínez-Hernández's unit, the government pointed out that, in addition to SIS's separate record-keeping, the defense had mischaracterized the testimony. The evidence was not that shakedowns in Unit 2-B became more frequent after Martínez-Hernández's arrival, but only that Albarati's visits to the unit became more frequent.[25]  The

---

[25]  Gil-Rodriguez did testify that Albarati conducted shakedowns of Martínez-Hernández's cell "[f]requently," but did not draw a comparison with searches before Martínez-Hernández was housed in Unit 2-B.  Gil-Rodriguez testified that he arrived at

government also reviewed the evidence unconnected to the Unit 2-B shakedown logbook to support its assertion that the logbook's contents were neither exculpatory nor material, and, hence, "its disclosure would have had no meaningful effect on the outcome at trial."

The district court denied the new trial motion in a docket order with the following brief explanation:

> Regarding the [R]ule 33 argument, the Court notes that any impeachment value of the shakedown logbook would not have changed the result of the consistent, overwhelming testimony and evidence presented by the government. More so, the instruction given to the jury as to the missing log book, permitted the defense to argue even beyond its impeachment value. Regarding Defendant's Brady argument, the Court likewise finds that no material prejudice to defendant resulted, given the overwhelming evidence and the Court's instruction as to the logbook.

## B. Applicable Law

### (1) Nature of the inquiry

We first note that this case involves the delayed disclosure of evidence rather than its complete suppression. The logbook was produced before the end of the trial, and defense counsel could have requested a continuance and -- if warranted -- asked to reopen the evidence before the case went to the jury.

MDC Guaynabo, and was placed in Unit 2-B, on October 16, 2012 -- roughly two months before Martínez-Hernández arrived in the unit in December 2012.

- 31 -

See, e.g., United States v. Mathur, 624 F.3d 498, 506 (1st Cir. 2010) ("The customary remedy for a Brady violation that surfaces mid-trial is a continuance and a concomitant opportunity to analyze the new information and, if necessary, recall witnesses."). The defense instead chose to proceed with the benefit of the spoliation instruction, albeit with the court's assurance that moving forward would not preclude a post-trial Brady claim based on the logbook's contents.

The government contends that these circumstances amount to waiver of the Brady claim because "the pertinent inquiry" for a delayed disclosure of evidence is "whether defendant's counsel was prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case." United States v. Avilés-Colón, 536 F.3d 1, 25 (1st Cir. 2008) (quoting United States v. Misla-Aldarondo, 478 F.3d 52, 63 (1st Cir. 2007)). The government argues that the defense was "prevented" from using the logbook at trial only because counsel "deliberately refus[ed]" to examine it, preferring to retain the advantage of the spoliation instruction. The government suggests that the post-trial Brady claim thus amounts to double dipping, and it urges us to deem the claim waived "to prevent gamesmanship in the future." Alternatively, the government urges us to view the Brady claim as forfeited and subject to plain-error review. See Avilés-Colón, 536 F.3d at 26 (noting parenthetically "that

- 32 -

defense counsel must typically request a continuance to preserve a claim of prejudice by delayed disclosure of evidence" (quoting United States v. Smith, 292 F.3d 90, 102 (1st Cir. 2002))). The claim would thus fail because Martínez-Hernández does not present a plain-error argument in his brief. See, e.g., United States v. Morales-Vélez, 100 F.4th 334, 345 (1st Cir. 2024).

Determining the proper lens for the Brady claim in this case is not a straightforward matter. As the government emphasizes, the defense rejected the opportunity to examine the logbook before the case was given to the jury or to seek a continuance so that its contents could be carefully reviewed. The government posits that Martínez-Hernández chose to "hedg[e] his bets in favor of the spoliation instruction" rather than losing the instruction and risking the possibility that the logbook would be unhelpful. The government maintains that the defense should bear the burden of that choice. On the other hand, the district court assured defense counsel that they would not waive any Brady claim if they opted to complete the trial as planned. Given that assurance, and the eleventh-hour appearance of the shakedown log, it is difficult to fault defense counsel for choosing to move forward with the trial. They could not know how long it would take to review the logbook to determine whether its contents were helpful and, if so, to devise a strategy for using the newly

disclosed information.[26]  The jury already had been instructed. The defense may have been concerned about the possible need for a lengthy continuance that would disrupt the continuity of the trial and affect the jurors' assessment of the evidence.  Hence, it may well be fair to say that "defendant's counsel [were] prevented by the delay from using the disclosed material effectively in preparing and presenting the defendant's case."  Misla-Aldarondo, 478 F.3d at 63 (quoting United States v. Ingraldi, 793 F.2d 408, 411-12 (1st Cir. 1986)).

The government's attempt to rebut this pragmatic view of the circumstances is unpersuasive, grounded as it is in unhelpful hindsight.  The government states in its brief that, given the reasons Martínez-Hernández now offers for needing the logbook, he could have made the judgment about its contents "easily by quickly glancing at [it] and then reopening his case."  At that moment, however, in deciding how to proceed when confronted with the startling revelation that the missing logbook had appeared -- i.e., whether to ask for a continuance or proceed with the spoliation instruction -- the defense could only guess at the value of the logbook.  Moreover, important to a fair assessment of the difficult choices posed for the defense, Martínez-Hernández had first

---

[26] Indeed, at one point when the court and parties were waiting for what turned out to be the wrong logbook to be scanned and sent, the judge observed that it "could take weeks to analyze" it.

requested the logbook three years before trial, and it was found in what appears to be an obvious location: the prison. Indeed, the district court judge was highly critical of the delay and made a point of observing "for the record" -- at sidebar, after the jurors left the courtroom to deliberate -- that he was "flabbergasted to say the least of the fact that this logbook was at MDC [Guaynabo] all the time."

We too are mystified and concerned that it took three years for the logbook to be found. Although the record reveals no improper conduct by the prosecutors themselves,[27] their failure to disclose material evidence may violate a defendant's due process rights "irrespective of [their] good or bad faith." Drumgold v. Callahan, 707 F.3d 28, 38 (1st Cir. 2013).[28] Moreover, the possible significance of the logbook to the defense in preparing for trial would have been obvious to the government. Given the prosecution

---

[27] Before expressing his dismay about the logbook's last-minute discovery at MDC Guaynabo, the trial judge acknowledged that "this has nothing to do with the U.S. Attorneys' Office or these two prosecutors." The judge went on to observe that he was putting his concern on the record "because I think that somebody at BOP will have to pay the consequences of not bringing that forth."

[28] The district court's fair observation that the prosecutors were not themselves responsible for the last-minute production of the logbook raises the question of when another government entity's failure to disclose evidence should be imputed to the prosecution under Brady. We need not decide where to draw the line in this case because, as we shall explain, Martínez-Hernández's Brady claim fails for other reasons.

theory that Martínez-Hernández and Ramos-Cruz were provoked to act because of Albarati's aggressive pursuit of contraband, including shakedowns that occurred on February 26, the record of activity in Unit 2-B during Martínez-Hernández's tenure there plainly would have appeared useful for cross-examining the government witnesses who testified that such searches occurred. It is difficult to understand why the logbook could be quickly located after the court issued its order demanding its immediate production but could not be found during the lengthy pre-trial phase of the case.

In these circumstances, we decline to view Martínez-Hernández's Brady claim as waived or forfeited based on defense counsel's decision to proceed as planned with closing arguments -- an approach the district court reasonably endorsed, while also assuring the defense that it would consider whether the logbook's late production warranted some form of post-trial relief. Accordingly, we treat Martínez-Hernández's Brady argument as a properly preserved suppression claim and assess it under the principles applicable to such claims.

We thus review the district court's denial of the motion for new trial based on the alleged Brady violation for "manifest abuse of discretion." United States v. Martínez-Mercado, 919 F.3d 91, 104-05 (1st Cir. 2019). As we have emphasized, in performing that review, we must be mindful that "the trial judge 'has a special sense of the ebb and flow of the trial[,] . . . [so] we

- 36 -

afford substantial deference to the [judge's] views regarding the likely impact of belatedly disclosed evidence." United States v. Tucker, 61 F.4th 194, 207 (1st Cir. 2023) (omission and second and third alterations in original) (quoting United States v. Peake, 874 F.3d 65, 70 (1st Cir. 2017)).

### (2) The required showing for a Brady violation

To obtain a new trial based on the government's violation of its obligations under Brady, a defendant must show that "(1) the evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence [was] suppressed by the government either willfully or inadvertently; and (3) prejudice . . . resulted." United States v. Paladin, 748 F.3d 438, 444 (1st Cir. 2014). To satisfy the prejudice element, "the defendant need demonstrate only a reasonable probability that, had the evidence been disclosed to the defense in a timely manner, the result of the proceeding would have been different." Tucker, 61 F.4th at 207 (emphasis omitted) (quoting United States v. Laureano-Salgado, 933 F.3d 20, 29 (1st Cir. 2019)). The "reasonable probability" standard does not require a showing that "the defendant would more likely than not have received a different verdict with the evidence." Smith v. Cain, 565 U.S. 73, 75 (2012). Rather, the question is whether "the likelihood of a different result is great enough to 'undermine[] confidence in the outcome of the trial.'" Id.

(alteration in original) (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)); see also Conley v. United States, 415 F.3d 183, 193 (1st Cir. 2005) (describing the inquiry as whether, in the absence of the withheld evidence, the defendant "received a fair trial, understood as a trial resulting in a verdict worthy of confidence").

Although Martínez-Hernández refers to the Unit 2-B shakedown logbook as both exculpatory and impeachment evidence, his arguments consistently rely on its contents to support his claim that multiple government witnesses gave false testimony, particularly about the February 26 shakedowns. We thus construe his Brady claim to rest on the lost impeachment value of the logbook. We previously have stated that "[i]mpeachment evidence must be material before its suppression justifies a new trial," Conley, 415 F.3d at 188, and we evaluate the materiality of such evidence "in the context of the entire record," id. at 189. As noted above, however, "[w]e do not apply these standards directly. In the first instance, that is the responsibility of the trial court," and our review is solely for abuse of discretion. Mathur, 624 F.3d at 504.

**C. Discussion**

Martínez-Hernández relies on the fact that the Unit 2-B logbook lacks entries for shakedowns in his or Ramos-Cruz's cell on February 26, 2013 to demonstrate the falsity of testimony that

he and Ramos-Cruz conspired to murder Albarati and resolved to put their plan into action immediately after those searches. Martínez-Hernández claims that timely access to the logbook would have allowed him to significantly undermine the government's case by showing that the shakedowns that supposedly prompted the killing did not happen, supporting his theory that the prison officials manufactured the case against him. However, as we shall explain, when the contents of the shakedown logbook are considered in light of the record as a whole, we detect no abuse of discretion in the district court's conclusion that the logbook's late production does not undermine confidence in the jury's verdict.

Most importantly, the record indicates that the omission of the February 26 shakedowns from the Unit 2-B logbook was of minimal significance. Former SIS Lieutenants Rosa and Rodriguez both testified at trial that shakedowns performed by SIS officers were not recorded in the unit logbook but were documented instead in the separate TrueView system.[29] When defense counsel pressed

_____

[29] It appears that no TrueView records related to February 26 were introduced at trial. At oral argument before this court, Martínez-Hernández's attorney stated that, to his knowledge, trial counsel did not request the relevant TrueView information and acknowledged that "[i]t should have been requested." Martínez-Hernández further indicates in his reply brief on appeal that no request for the TrueView records was made. See Reply Br. at 36 (stating that earlier production of the Unit 2-B logbook would have "provoked a request for the True View system").

The record, however, does indicate that some SIS materials were sought. The defendants' joint discovery request in 2015

Rosa about the recording of shakedowns, Rosa insisted that "[w]e're not responsible for the shakedown log. The one responsible is the housing unit officers." Rodriguez likewise testified that the unit shakedown logbook "is exclusively for the officers at the unit." In other words, according to these witnesses, the fact that no record of the February 26 shakedowns by Albarati and a colleague appears in the Unit 2-B logbook does not mean that they did not happen.

Martínez-Hernández questions the testimony about the non-recording of SIS shakedowns in unit logbooks by pointing out that the Unit 2-B logbook contains seven entries with Albarati's signature. However, the government explained in its response to Martínez-Hernández's motion for new trial that Albarati signed the

---

listed ninety-two categories of items, including, as item #36, "[a]ll SIS information/intelligence maintained in the SIS office in relation to inmate contraband and/or smuggling of contraband and prohibited items by BOP staff, Officers or contractors for the past 5 years." The BOP's response to item #36 focused only on the possible staff misconduct, however, not on information concerning inmate contraband. The joint discovery request also listed, as item #18, "[a]ll records documenting the discovery of contraband/prison weapons at MDC Guaynabo for the period January 1, 2008 through May 1, 2013." The BOP response stated that "[r]elevant information is enclosed" and that "[i]f any additional information becomes available it will be provided expeditiously."

We need not look further, however, into the seeming uncertainty surrounding the discovery related to the TrueView records. Martínez-Hernández does not argue as part of his Brady claim that the government improperly withheld TrueView information, and, hence, we treat the absence of that information as simply a gap in the record.

logbook only in his role as shift supervisor "to verify that the Shakedown log had been completed on a particular shift," and not to record shakedowns he had performed.

Although the government gave no details in this response about when SIS officers would serve as shift supervisors, the Unit 2-B logbook itself supports a distinction between the entries that reflect the recording of shakedowns by housing unit officers and the end-of-shift verifications such as those entered by Albarati. The logbook contains daily lists of shakedowns arranged in a seven-column format. For each recorded search, the information provided in separate columns includes the search location (such as the prison cell number), the name of the inmate whose area was searched, the items found, and the searching staff member's name or initials. Each daily list is typically followed by a signature on a separate line, spanning multiple columns, with some additional notations. The entries containing Albarati's signature appear in that latter format.[30] Martínez-Hernández identifies no seven-column entries for shakedowns performed by SIS officers -- thereby

_____

[30] Some notations in the Unit 2-B logbook are difficult to read as reproduced in the appendix submitted on appeal, but the government explained in its response to Martínez-Hernández's motion for new trial that Albarati's entries include abbreviations standing for "Evening Watch Rounds" and "Activity Lieutenant." The three entries cited by Martínez-Hernández for December 24 and 25, 2012, and January 9, 2013 -- when he was housed in Unit 2-B -- all contain those abbreviations and appear to include the signature the government attributes to Albarati.

reinforcing, rather than refuting, the testimony concerning separate recording methods.[31]

In another attempt to discredit the witnesses' account of the February 26 shakedowns, Martínez-Hernández emphasizes that, while the Unit 2-B logbook fails to record the searches supposedly conducted on that day, it does list a similarly described shakedown of Ramos-Cruz's cell four days before Albarati's murder. But the fact of a previous search does not contradict the testimony of a search by SIS officers on February 26 that -- consistent with the prison's practice -- would be documented in the TrueView system and not the unit logbook.

Martínez-Hernández makes two additional points about the significance of the Unit 2-B logbook that warrant our attention. First, in both his motion for new trial and in his brief on appeal, Martínez-Hernández cites an FBI debriefing of Lieutenant Jose Correa, the prison officer who witnesses said conducted the February 26 shakedowns with Albarati. In the description of that

_____

[31] In his post-trial filings in the district court, Martínez-Hernández also highlighted Rosa's testimony that SIS officers "don't write nothing in that book." Rosa's testimony, however, was given in response to cross-examination in which he was asked if the shakedown in Ramos-Cruz's cell on February 26, and the items seized, were documented in the unit logbook. In that context, Rosa's testimony that SIS officers do not write in the unit logbook can be understood to mean they do not make shakedown entries -- and, hence, Rosa's "don't write nothing" testimony is not meaningfully at odds with Albarati's signatures in the format we have described.

- 42 -

interview recorded in an FBI Form 302 -- a document not introduced into evidence -- Correa described shakedowns involving Ramos-Cruz and Martínez-Hernández resembling the ones that witnesses said occurred on February 26 but which Correa said happened roughly two weeks earlier. Correa also said in the interview that he saw Albarati only briefly on the day of the murder. Correa did not testify at the trial. In his reply brief, Martínez-Hernández asserts that Correa "refused to testify on the [g]overnment's behalf," and in his motion for new trial, he claimed that "[t]he defense was . . . blindsided by the prosecution's unannounced and apparently last-minute decision" not to call Correa as a witness. With these assertions, Martínez-Hernández insinuates that Correa's testimony would have hurt the government's case and he claims that, without access to Correa at trial, the defense needed the logbook to "straighten[] the record" -- i.e., to reveal "the numerous inconsistencies" between Correa's account and the accounts of the four witnesses who testified about the February 26 shakedowns.

As we have explained, however, given the testimony concerning the separate SIS recording system, the contents of the Unit 2-B logbook would not have discredited the testimony of the four witnesses who described the events of February 26. To be sure, Correa's FBI interview, which was conducted a little more than a year after Albarati's murder, is puzzling in its variance from the four witnesses' testimony. The defense understandably

would have hoped to question Correa about those inconsistencies. But we cannot conclude that the logbook would have compensated for Correa's absence from trial by shedding light on the differing accounts.[32]

Second, and relatedly, Martínez-Hernández attacks the government's post-trial reliance on the TrueView system to diminish the evidentiary value of the missing Unit 2-B logbook. In his appellate oral argument, Martínez-Hernández's attorney observed that, if the February 26 searches appeared in the TrueView system, the government would have presented the records at trial because "that would have been an important piece of . . . independent, reliable evidence that the event actually did take place." And, similarly, Martínez-Hernández notes in his reply brief that, if the February 26 shakedowns occurred as the witnesses testified, the government could have elicited testimony about them from the SIS technician who was responsible for entering such information in the TrueView system (and who was a witness at trial).

But neither of these points advances Martínez-Hernández's claim that the Brady violation "put[s] the whole case in such a different light as to undermine confidence in

_____

[32] Martínez-Hernández makes no independent claim of error based on what he describes as the government's unanticipated decision not to call Correa as a witness.

the verdict." Flores-Rivera, 787 F.3d at 17-18 (quoting Avilés-Colón, 536 F.3d at 19). Even if information from the TrueView system would have helped the government, the prosecutors reasonably may have felt comfortable relying on the largely consistent testimony about the February 26 shakedowns from four different witnesses, including two correctional officers. By contrast, in the face of the testimony from former SIS Lieutenants Rosa and Rodriguez that SIS shakedowns were entered into the TrueView system -- and not recorded in the housing unit logbooks -- Martínez-Hernández seemingly had good reason to ask the SIS technician if the February 26 shakedowns had been documented in that system.[33] If he believed that all four witnesses had fabricated those shakedowns -- something he presumably would know as the purported subject of one of the searches -- he did not need the missing logbook to see the value of such questioning.[34]

With the uncontradicted testimony about the separate SIS and unit shakedown records, together with the format of Albarati's

---

[33] The SIS technician, Ramón Tarafa-Ortíz ("Tarafa"), testified four days (including a weekend) after Rosa initially testified that it was the responsibility of the two SIS technicians, including Tarafa, "to load all information data in the TrueView system." Rodriguez also testified before Tarafa, with a weekend between their appearances as witnesses.

[34] We note again here the lack of any claim that the government improperly withheld the TrueView records from the defense. See supra note 29.

entries in the Unit 2-B logbook, we think it likely that the jury would have rejected any contention that the logbook proved the falsity of the witness accounts of the February 26 shakedowns. Indeed, the district court supportably observed in its order denying the new trial motion that the spoliation instruction "permitted the defense to argue even beyond [the logbook's] impeachment value." If the logbook had been available and introduced into evidence, the government would have been able to discount the significance of its contents as described above. Yet, as we have recounted, the jurors were explicitly told by the court that they could presume the "missing" logbook would have been "useful" to the defense.[35] An even stronger message was conveyed

---

[35] The full instruction given to the jurors -- the day before the logbook appeared -- was as follows:

> Mr. Martínez-Hernández requested the shakedown logbook for Unit 2-B at MDC Guaynabo from October 17, 2012 to February 28, 2013, dates during which Mr. Martínez[-Hernández] was detained at said unit, Unit 2-B. This document was not located and the Bureau of Prisons informed that it cannot be located. Now, that is a fact that is stipulated by the parties so, again, that is evidence and you're to consider it as a true fact.
>
> Now, this particular fact and this particular evidence you may use this fact to infer, but do not have to, that the logbook and the information therein would have been useful to Mr. Martínez[-]Hernández in presenting . . . his case. So, again, that is limited, this stipulation, to the shakedown logbook. And you heard about the shakedowns

in closing arguments by defense counsel, who told the jurors they were entitled to infer "that the contents of that book would have somehow exculpated or helped the case of Martínez-Hernández" and that "we don't have that book for mysterious circumstances."  The defense had earlier suggested such a mystery when cross-examining former SIS Lieutenant Rodriguez, eliciting his acknowledgment that logbooks rarely go missing -- and when they do, it is typically older ones that had been placed in storage rooms or archives, not "contemporaneous ones" like the Unit 2-B logbook at issue here.[36]

Nor can we conclude that the missed opportunity to use the Unit-2B logbook to cross-examine the witnesses who testified about the February 26 shakedowns prejudicially affected the jury's view of the trial evidence overall.  Evidence from multiple witnesses established that the murder plot already was in process

and that there is a logbook.  And, again, in this case that logbook for those particular dates from October 17, 2012 to February 28, 2013, when Mr. Martínez was at Unit 2-B, that Unit 2-B shakedown logbook was not found.

[36] The defense also specifically relied on the logbook's absence to support its attempt to place suspicion on other inmates, observing to the jurors that "[i]t's very likely that that book would have shown searches of cells and the bodies of other inmates, not Mr. Martínez-Hernández, with a lot of frequency which may have led you to think that there were other people with equal or more motive to carry out this murder."  Defense counsel made at least three other references to the missing logbook in closing arguments, including telling the jurors that they could "determine that the information that would have been in the 2-B logbook was good for the defense and bad for the government."

by February 26. Carlos Alberto Rosado-Rosado, a charged coconspirator who drove the two "triggermen" to the crime, testified that he and one of the shooters had "passed by" MDC Guaynabo the day before the murder -- i.e., on February 25 -- "to learn the route, the exit and stuff." In addition, Velázquez-Vázquez testified that the murder plans were underway earlier, see supra Section II.B, and another witness who was an inmate at MDC Guaynabo, Jorge Asencio-Viera, testified that he was told about the plan to murder Albarati "[t]wo days before" February 26. Gil-Rodriguez testified that he first learned that Martínez-Hernández and Ramos-Cruz were planning the murder "[s]everal days after Api arrived" in Unit 2-B on February 16.[37]

The record viewed in its entirety thus diminishes the significance of the reported shakedowns on February 26. Rather, the evidence overwhelmingly shows simmering hostility between Albarati and Martínez-Hernández -- stemming from his aggressive pursuit of contraband -- and the existence of a joint plan with Ramos-Cruz to kill the officer that was underway within days of Ramos-Cruz's arrival in Unit 2-B. Although the defense vigorously sought to cast doubt on the credibility of the government's

---

[37] Although not all of this prior-planning evidence specifically implicates Martínez-Hernández, he was identified by coconspirator Velázquez-Vázquez as essential to moving the plot forward because of his willingness to provide funding. See supra Section II.B.

witnesses, the Unit 2-B logbook -- for the reasons detailed above -- would not have meaningfully added to the defense's ability to challenge the witnesses' testimony.

None of Martínez-Hernández's other arguments about how the missing logbook would have made a difference at trial carry much weight. He points out that, contrary to testimony presented by the government, the logbook shows that the frequency of shakedowns in Unit 2-B did not increase once he arrived -- and, hence, the logbook content belies the theory that Martínez-Hernández was angry because Albarati was bearing down on him. But, as noted above, Martínez-Hernández incorrectly characterizes testimony about an increase in visits to Unit 2-B as referring to an increase in shakedowns. See supra Section III.A. Albarati's presence, even without a search, presumably would have interfered with Martínez-Hernández's contraband activities. Martínez-Hernández also emphasizes that the logbook shows that no contraband was seized from him "during the entire time he was in Unit 2-B," again suggesting a lack of support for the government's theory that he was motivated to kill Albarati because of the officer's overbearing pursuit of contraband. As described above, however, multiple witnesses testified that Martínez-Hernández typically avoided responsibility for contraband belonging to him by recruiting others to take the blame.

In sum, we see no basis for second-guessing the district

court's assessment of the evidence and its conclusion that Martínez-Hernández failed to demonstrate the requisite reasonable probability of prejudice from the untimely production of the Unit 2-B shakedown log. Although Martínez-Hernández attempts to equate the circumstances here with those in Flores-Rivera, where we found a prejudicial Brady violation, see 787 F.3d at 21, the withheld evidence here does not contradict the witness testimony at issue, as it did there, see id. at 18. Given the limited probative value of the information from the logbook that Martínez-Hernández deems most critical -- the absence of an entry for a February 26 shakedown involving him or Ramos-Cruz -- together with the benefit afforded to him by the spoliation instruction, we discern no abuse of discretion in the district court's determination that Martínez-Hernández failed to show "a reasonable probability that, had the [withheld] evidence been disclosed to the defense in a timely manner, the result of the proceeding would have been different." Tucker, 61 F.4th at 207 (emphasis omitted) (quoting Laureano-Salgado, 933 F.3d at 29).

### IV. Improper Admission of Hearsay Statements

Martínez-Hernández also argues that the district court abused its discretion by admitting into evidence, through the testimony of four other inmates, statements that Ramos-Cruz made about Martínez-Hernández's involvement in the murder conspiracy. He claims that the reported comments do not qualify as

- 50 -

coconspirators' statements under Federal Rule of Evidence 801(d)(2)(E) and United States v. Petrozziello, 548 F.2d 20, 22-23 (1st Cir. 1977), because the evidence adduced at trial does not support the two required findings for that classification: that (1) "it is more likely than not that the declarant [Ramos-Cruz] and the defendant were members of a conspiracy when the hearsay statement[s were] made, and [(2)] that the statement[s were] in furtherance of the conspiracy." United States v. Ruiz, 999 F.3d 742, 748 (1st Cir. 2021) (quoting Petrozziello, 548 F.2d at 23). Thus, Martínez-Hernández argues, the inmates' testimony concerning Ramos-Cruz's comments was inadmissible hearsay evidence.

However, Martínez-Hernández fails in his opening brief to identify any specific statement that he claims was improperly admitted or provide record citations for the challenged testimony, contrary to Federal Rule of Appellate Procedure 28. See Fed. R. App. P. 28(a)(8)(A) (requiring the argument section of an appellant's brief to include the "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies" (emphases added)); 28(e) ("A party referring to evidence whose admissibility is in controversy must cite the pages of the appendix or of the transcript at which the evidence was identified, offered, and received or rejected."). Rather, Martínez-Hernández first broadly asserts that the court improperly admitted the hearsay statements

- 51 -

of the four named witnesses because neither Petrozziello prerequisite was satisfied, and he then goes on to recite well established legal principles governing a district court's "Petrozziello ruling" without connecting those principles to the testimony he challenges here.

It is Martínez-Hernández's responsibility to specify the statements to which he objects.[38] See United States v. Isabel, 945 F.2d 1193, 1199 & n.12 (1st Cir. 1991). That particularity is important not only so that we may assess the claim of error, but also so that we may determine whether any error detected was harmless. See id.; see also, e.g., United States v. Weadick, 15 F.4th 1, 10-11 (1st Cir. 2021); United States v. Ford, 839 F.3d 94, 108 (1st Cir. 2016). To illustrate the problem created by the lack of specificity, the direct- and cross-examination of Gil-Rodriguez -- one of the four witnesses whose testimony is challenged for containing hearsay -- spans more than one hundred pages of transcript (including sidebar conferences). At trial, Martínez-Hernández's counsel conceded that certain of Gil-Rodriguez's particularly damaging testimony was admissible (albeit

---

[38] Even in his reply brief, when responding to the government's assertions of waiver and forfeiture, Martínez-Hernández refers only generally to statements dubbed "Api's bedside tales" -- i.e., comments that Gil-Rodriguez said Ramos-Cruz made after the cellmates were locked down at night. Martínez-Hernández makes no reference at all to the testimony of the other three witnesses that he claims was improper.

subject to cross-examination) because Gil-Rodríguez claimed he was present when Martínez-Hernández made the inculpatory comments at issue. Without guidance from Martínez-Hernández, we decline to scrutinize the transcript to find, and evaluate in the context of the entire record, the statements that he claims were erroneously, and prejudicially,[39] allowed into evidence.

In sum, although appellant provides us with ample precedent on the evidentiary requirements for the admission of coconspirator statements as non-hearsay, he neglects to apply that precedent to any specific statements he claims were improperly admitted at his trial. Hence, because Martínez-Hernández has failed to "put flesh on [the] bones" of his hearsay argument -- effectively asking "the court to do counsel's work" -- we view this claim as waived for lack of "developed argumentation." United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

## V. Government Misconduct

In a wide-ranging argument primarily directed at the district court's refusal to dismiss the indictment against him, Martínez-Hernández asserts multiple forms of government misconduct: prosecutorial conflict-of-interest, the fabrication and manipulation of evidence to secure the indictment, suborning

---

[39] We wish to make clear that, in noting that any Petrozziello error would be subject to harmless-error analysis, we by no means suggest that the district court made such an error.

perjury from trial witnesses, and improper interference with the defense.[40]   Other than his claim of interference based on the government's withholding of the shakedown logbook, Martínez-Hernández offers only unsupported accusations of sinister behavior.  He asserts, for example, that the prosecution team "knew it did not have any evidence implicating [Martínez-Hernández] in the murder of Lt. Albarati and opted to manipulate evidence to wrongly accuse him of a crime he did not commit."  He claims that prosecutors engaged in this misconduct in retaliation for his report of a conflict of interest involving a former Assistant U.S. Attorney who originally was a member of the prosecution team.[41]   He

------

[40] The government points out that Martínez-Hernández's motion to dismiss the indictment premised his claim of government misconduct solely on the alleged conflict of interest of the original supervising prosecutor, and the government argues that he has therefore waived his other misconduct contentions by failing in his opening brief to either assert or establish "good cause" for not raising them pre-trial.  See Fed. R. Crim. P. 12(c)(3).  We bypass the waiver issue, however, because the arguably unpreserved misconduct arguments otherwise fail.

[41] Martínez-Hernández claims that the named AUSA

> was implicated in the forbidden act of authorizing a former prosecutor . . . to participate in the defense of several criminal cases against [Martínez-Hernández] where [that former prosecutor] had been the prosecutor that developed a cooperating witness who would have testified against [Martínez-Hernández] if he went to trial, creating an actual conflict of interest in her representation.  This could only be avoided by [Martínez-Hernández's] pleading guilty, which she ended up doing [on his behalf], abandoning

- 54 -

further insists that, when new prosecutors took over trial preparation, they "solicited and allowed a parade of perjured, false testimony [to] go uncorrected."[42]

As the government points out, Martínez-Hernández offers no proof for any of these accusations of manipulation, fabrication, and knowingly false testimony, other than pointing to information and omissions in the shakedown logbook that he claims reveal the falsity in multiple witnesses' testimony. At bottom, appellant's

every legitimate defense issue[] he had available in having his indictments dismissed.

In his motion to dismiss the indictment in this case, Martínez-Hernández quoted a filing in those earlier cases claiming that he "was for all legal purposes being prosecuted and defended at the same time by the government."

[42] One such claim of perjured testimony concerns Velázquez-Vázquez. Martínez-Hernández asserts, in effect, that the government asked the grand jury to indict Velázquez-Vázquez even though he was not involved in the murder plot so the prosecution could "obtain[] the direct coconspirator witness they needed to boost their trial evidence as to [Martínez-Hernández's] participation, which otherwise they did not have." Velázquez-Vázquez's testimony at trial does not support such a claim of government misconduct. To be sure, when asked if he "agree[d] to participate directly in the murder of Lieutenant Albarati," Velázquez-Vázquez responded: "I said I didn't want to be in the car because I didn't like killing that type of person." He then explained what he meant by "that type of person": "[T]he way I saw it that person hadn't done anything wrong to me." However, Velázquez-Vázquez did not say he was uninvolved in the planning. To the contrary, he went on to describe meetings he attended "regarding the murder of Lieutenant Albarati." His testimony also established that he pleaded guilty only to the conspiracy count in the indictment and that his plea agreement identified him as a "minimal" participant.

scattershot misconduct claim is largely another version of his sufficiency argument, similarly relying on favorable inferences -- in this instance, from mostly unverifiable "facts." We therefore see no abuse of discretion in the district court's denial of Martínez-Hernández's motion to dismiss the indictment.[43] See United States v. Therrien, 847 F.3d 9, 14 (1st Cir. 2017) ("When reviewing a trial court's denial of a motion to dismiss an indictment, this court reviews 'legal questions de novo, any factual questions for clear error, and the court's ultimate ruling for abuse of discretion.'" (quoting United States v. Parigian, 824 F.3d 5, 9 (1st Cir. 2016))).

Moreover, the lack of substantiation for Martínez-Hernández's accusations negates any argument that the circumstances here establish an "exception to th[e] harmless error rule" governing grand jury errors. Calderón, 829 F.3d at 94. It is well established that the "petit jury's verdict of guilty beyond a reasonable doubt demonstrates a fortiori that there was probable cause to charge the defendant[] with the offense[] for which [he] was convicted" -- rendering "any error in the grand jury proceeding connected with the charging decision . . . harmless beyond a

---

[43] The district court denied the motion in a docket order, noting that the misconduct Martínez-Hernández alleged had occurred in a prior case and "[a]ny purported misconduct by the USA in [that] case, even as alleged by Defendant, does not lead to a finding of prejudice in this murder case, which would bar a prosecution."

reasonable doubt." Id. (alterations in original) (quoting United States v. Mechanik, 475 U.S. 66, 67, 70 (1986)).  The exception to that rule applies only to "prosecutorial misconduct 'so grave that it calls into doubt the fundamental fairness of the judicial process.'"  Id. (quoting United States v. Ortiz de Jesús, 230 F.3d 1, 4 (1st Cir. 2000)); see also United States v. Anzalone, 923 F.3d 1, 5 (1st Cir. 2019) ("In limited circumstances, courts may dismiss criminal charges in response to outrageous government misconduct." (quoting United States v. Djokich, 693 F.3d 37, 43 (1st Cir. 2012))).  Martínez-Hernández has shown no such unfairness in his prosecution or trial.

## VI.  Cumulative Error & Conclusion

Having found none of Martínez-Hernández's other claims viable, his claim of cumulative error is a non-starter. Accordingly, we affirm the judgment of conviction on each of the six charged counts.

So ordered.